Michael P. Lehmann (77152, mlehmann@cmht.com)
**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
One Embarcadero Center
Suite 2440
San Francisco, CA 94111
Tel:  (415) 986-3321
Fax:  (415) 986-3643

*Attorneys for Plaintiff Monikraft, Inc.*

### IN THE UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONIKRAFT, INC., individually and on behalf of a class of all those similarly situated, | Case No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| CHUNGHWA PICTURE TUBES, LTD., CHUNGHWA PICTURE TUBES (MALAYSIA) SDN. BHD., HITACHI, LTD., HITACHI AMERICA, LTD., HITACHI ASIA, LTD., IRICO GROUP CORP., IRICO DISPLAY DEVICES CO., LTD., LG ELECTRONICS, INC., MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD., PANASONIC CORPORATION OF NORTH AMERICA, ORION ELECTRIC CO., LTD., ORION AMERICA, INC., KONINKLIJKE PHILIPS ELECTRONICS N.V., PHILIPS ELECTRONICS NORTH AMERICAN, SAMSUNG SDI CO., LTD., SAMSUNG SDI AMERICA, INC., SAMTEL COLOR, LTD., THAI CRT COMPANY, LTD., TOSHIBA CORPORATION, BEIJING-MATSUSHITA COLOR CRT COMPANY, LTD., AND LP DISPLAYS INTERNATIONAL, LTD. | **JURY TRIAL DEMANDED** |
| Defendants. | |

COHEN, MILSTEIN,
HAUSFELD & TOLL,
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON

1    Plaintiff MoniKraft, Inc. ("Plaintiff"), individually and on behalf of a class of all those

2  similarly situated, brings this action for treble damages and costs of suit under the antitrust laws

3  of the United States against Defendants Chunghwa Picture Tubes, Ltd., Chunghwa Picture Tubes

4  (Malaysia) Sdn. Bhd., Hitachi, Ltd., Hitachi America, Ltd., Hitachi Asia, Ltd., Irico Group Corp.,

5  Irico Display Devices Co., Ltd., LG Electronics, Inc., Matsushita Electric Industrial Co., Ltd.,

6  Panasonic Corporation of North America, Orion Electric Co., Ltd., Orion America, Inc.,

7  Koninklijke Philips Electronics N.V., Philips Electronics North American, Samsung SDI Co.,

8  Ltd., Samsung SDI America, Inc., Samtel Color, Ltd., Thai CRT Company, Ltd., Toshiba

9  Corporation, Beijing-Matsushita Color CRT Company, Ltd., Matsushita Toshiba Picture Display

10  Co. Ltd., and LP Displays International, Ltd. (collectively, "Defendants").

## NATURE OF THE CASE

11

12    1.    This lawsuit is brought on behalf of direct purchasers (the "Class") in the United

13  States of cathode ray tubes and products containing cathode ray tubes ("CRT Products" or

14  "CRTs"), as the term is defined in this Class Action Complaint (the "Complaint"), who

15  purchased CRT Products directly from Defendants or their predecessors, parents, subsidiaries, or

16
     affiliates from January 1, 1995 to the present (the "Class Period"). Defendants are the leading

17
18  manufacturers of televisions, computer monitors, and/or other electronic devices which contain

19  CRTs. Defendants control a majority of the CRT industry, which in 1999 alone resulted in over

20  $19 billion dollars in gross revenue. Virtually every household in the United States owns, or has

21  owned, at least one CRT Product during the Class Period.

22    2.    In the mid-1990's, the CRT industry began facing tremendous economic pressure

23  due to the emergence of more modern technology that shrank Defendants' profits and threatened

24
     the sustainability of the industry. Plaintiff believes that in order to extend the life of the CRT

25
26  market, during the Class Period, Defendants and their co-conspirators manufactured and/or sold

27  CRTs, and all Defendants entered into and implemented a continuing contract, combination or

28

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON

| CLASS ACTION COMPLAINT | -2- | |

conspiracy to fix, raise, maintain or stabilize prices for CRTs sold to purchasers in the United

States and throughout the world. Plaintiff further believes, and thereon alleges, that Defendants

fraudulently concealed their anticompetitive conduct from Plaintiff and the Class in furtherance

of the conspiracy. Because of Defendants' unlawful conduct, Plaintiff and the Class paid

artificially inflated prices for CRTs, and as a result, have suffered antitrust injury to their

business or property. Such prices exceeded the amount they would have paid if the price for

CRT Products had been determined by a competitive market.

### JURISDICTION AND VENUE

3.      Plaintiff brings this action pursuant to Section 1 of the Sherman Act, 15 U.S.C.

§§ 1, to recover treble damages and the costs of this suit, including reasonable attorneys' fees,

for injuries sustained by Plaintiff and the Class as a result of Defendants' violation of Section 1

of the Sherman Act, 15 U.S.C. § 1, as alleged in this Complaint.

4.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337(a) and 1367.

5.      Venue is proper in this Judicial District pursuant to 15 U.S.C.§§ 15 and 22 and 28

U.S.C § 1391(b) and (c) because during the Class Period, Defendants resided, transacted

business, were found, or had agents in this District, and a substantial portion of the affected

interstate trade and commerce described below has been carried out in this District.

6.      This Court has personal jurisdiction over each Defendant because, inter alia, each

Defendant: (a) transacted business throughout the United States, including in this District; (b)

manufactured, sold, shipped, and/or delivered substantial quantities of CRTs throughout the

United States, including this District; (c) had substantial contacts with the United States,

including in this District; and/or (d) was engaged in an illegal scheme and price-fixing

conspiracy that was directed at and had the intended effect of causing injury to persons residing

in, located in, or doing business throughout the United States, including in this District. Further

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON

**CLASS ACTION COMPLAINT**                                    -3-

jurisdictional contacts are alleged below.

## DEFINITIONS

7.    "Class Period" means the period from January 1, 1995 through the present.

8.    "Person" means any individual, partnership, corporation, association or other business or legal entity.

9.    "CRTs," as the term is used in this Complaint, consist of a vacuum tube that is coated on the inside with light sensitive phosphors. An electron gun, located at the back of the vacuum tube, emits electron beams. When those electron beams strike the phosphors, the phosphors produce either a red, green, or blue light. Magnetic fields and varying voltages inside the CRT direct the beams to produce the desired color. This process, if repeated several times per second, produces the desired image. "CRT Products," as the term is used in this Complaint, consist of display products such as televisions, computer monitors, automated teller machines, video game machines, video cameras, oscilloscopes, radar displays, medical electronics and avionics.

## PLAINTIFF

10.    Plaintiff MoniKraft, Inc. ("MoniKraft" or "Plaintiff") is a Corporation with its principal place of business located at 16 Gate House Lane, Cherry Hill, New Jersey 08003. During the Class Period, MoniKraft purchased CRTs and CRT Products directly from one or more of the Defendants or their predecessors, parents, subsidiaries, or affiliates and suffered antitrust injury to its business or property by reason of the antitrust violations alleged herein.

## DEFENDANTS

11.    Defendant Chunghwa Picture Tubes, Ltd. is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan. In 1971, Chunghwa was established by Tatung Corporation to manufacture CRTs. In 1974, the company

| CLASS ACTION COMPLAINT | -4- | |

received certification from the United States, giving it entry into the United States market. By 1991, Chunghwa Picture Tubes, Ltd. had earned the leading position in the global CRT market. Ten years later, in 2001, Chunghwa Picture Tubes, Ltd. maintained its position as one of the top two competitors in the worldwide CRT market with a market share of 15 to 20 percent. During the Class Period, Chunghwa Picture Tubes, Ltd. manufactured, sold, and distributed CRT Products throughout the United States.

12.    Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot 1, Subang Hi-Tech Industrial Park, Baru Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia. Chunghwa Malaysia is a wholly-owned and controlled subsidiary of Chunghwa Picture Tubes, Ltd. The company is focused on CRT production, and has established itself as one of the leading worldwide suppliers of CRTs. Its product line ranges from 10-inch CRTs to 29-inch CRTs. During the Class Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products throughout the United States.

13.    Defendants Chunghwa Picture Tubes, Ltd. and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

14.    Defendant Hitachi, Ltd. is a Japanese company with its principal executive office at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products. In 1996, Hitachi, Ltd.'s had a 20 percent worldwide market share for color CRTs. During the Class Period, Hitachi, Ltd. manufactured, sold, and distributed CRT Products throughout the United States.

**CLASS ACTION COMPLAINT**                                     -5-

15.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business at 2000 Sierra Point Parkway, Brisbane, California. Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Class Period, Hitachi America sold and distributed CRT Products manufactured by Hitachi, Ltd, throughout the United States.

16.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business at 16 Collyer Quay, #20-00 Hitachi Tower, Singapore 049318. Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Class Period, Hitachi Asia manufactured, sold, and distributed CRT Products throughout the United States.

17.    Defendants Hitachi, Ltd., Hitachi America, and Hitachi Asia are collectively referred to herein as "Hitachi."

18.    Defendant Irico Group Corporation is a Chinese entity located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. Irico Group Corporation is the parent company for multiple subsidiaries engaged in the manufacture, distribution, and sale of CRT Products. During the Class Period, Irico Group Corporation manufactured, sold, and distributed CRT Products throughout the United States.

19.    Irico Display Devices Co., Ltd. is a Chinese entity located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075. Irico Display Devices Co., Ltd. is a partially-owned subsidiary of Defendant Irico Group Corp. Irico Display Devices Co., Ltd. was China's top CRT maker in 2006. During the Class Period, Irico Display Devices Co., Ltd. manufactured, sold, and distributed CRT Products throughout the United States.

20.    Defendants Irico Group Corporation and Irico Display Devices, Co., Ltd, are

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON

CLASS ACTION COMPLAINT    -6-

1  collectively referred to herein as "Irico."

2      21.    Defendant LG Electronics, Inc. ("LG Electronics") is a Korean entity

3  headquartered at LG Twin Towers 20, Yeouido-dong, Yeongdeungpo-gu, Seoul, South Korea

4  150-721. In 2001, LG Electronics entered into a joint venture with Defendant Koninklijke

5  Philips Electronics N.V. called LG.Philips Displays, thereby combining their CRT businesses.

6

7  In 2002, LG Electronics had a worldwide CRT market share of 24.4 percent. On April 1, 2007,

8  LG.Philips Displays became an independent company and changed its name to LP Displays

9  International, Ltd. During the Class Period, LG Electronics manufactured, sold, and distributed

10  CRT Products throughout the United States.

11      22.    Defendant Matsushita Electric Industrial Co., Ltd. ("Matsushita Electric") is a

12  Japanese entity located at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.

13  Matsushita Electric entered into a joint venture with Defendant Toshiba Corporation in 2002

14  called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs. Matsushita Electric

15  held a 64.5 percent majority stake in the company. On April 3, 2007, Matsushita Electric

16

17  purchased the remaining 35.5 percent stake in the joint venture, making it a wholly-owned

18  subsidiary of Matsushita Electric. Matsushita Electric is best known for its Panasonic brand,

19  which in 2005 had the highest CRT revenue in Japan. During the Class Period, Matsushita

20  Electric sold and distributed CRT Products throughout the United States.

21

22      23.    Defendant Panasonic Corporation of North America ("Panasonic") is a Delaware

23  corporation with its principal place of business at One Panasonic Way, Secaucus, New Jersey.

24  Panasonic is a wholly-owned and controlled subsidiary of Defendant Matsushita Electric.

25  During the Class Period, Panasonic sold and distributed CRT Products manufactured by

26  Matsushita Electric.

27

28      24.    Defendants Matsushita Electric and Panasonic are collectively referred to herein

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON

CLASS ACTION COMPLAINT                                    -7-

as "Matsushita."

25.      Defendant Orion Electric Co., Ltd. is a Japanese company with its principal place of business at 41-1 Iehisa-cho Echizen-shi Fukui 915-8555, Japan.  It is the parent company of the Orion entities. Currently, Orion Electric, Ltd. manufactures CRT Products for Defendant Toshiba Corporation.  During the Class Period, Orion Electric Co., Ltd. manufactured, sold, and distributed CRT Products throughout the United States.

26.      Defendant Orion America, Inc. ("Orion America") is an Indiana corporation with its principal place of business at Hwy 41 North, Orion Place, Princeton, Indiana.  Orion America is a wholly-owned and controlled subsidiary of Defendant Orion Electric Co., Ltd.  During the Class Period, Orion America manufactured, sold, and distributed CRT Products throughout the United States.

27.      Defendants Orion Electric Co., Ltd. and Orion America are collectively referred to herein as "Orion."

28.      Defendant Koninklijke Philips Electronics N.V. ("Royal Philips"), which translates to Royal Philips Electronics, is a Dutch entity with its principal place of business at Breitner Center, Amstelplein 2, 1096 BC Amsterdam, The Netherlands.  Royal Philips was the leading global supplier of CRTs in 2000.  In 2001, Royal Philips entered into a joint venture with Defendant LG Electronics called LG.Philips Displays, in which the entities combined their CRT businesses.  On April 1, 2007, LG.Philips Displays became an independent company and changed its name to LP Displays International, Ltd.  During the Class Period, Royal Philips manufactured, sold, and distributed CRT Products throughout the United States.

| CLASS ACTION COMPLAINT | -8- | |

29.    Defendant Philips Electronics North America ("Philips America") is a Delaware corporation with its principal place of business at 1251 Avenue of the Americas, New York, New York, 10020. Philips America is a subsidiary of Defendant Royal Philips. During the Class Period, Philips America sold and distributed CRT Products manufactured by Royal Philips throughout the United States.

30.    Defendants Royal Philips and Philips America are collectively referred to herein as "Philips."

31.    Defendant Samsung SDI Co., Ltd. ("Samsung SDI") is a Korean company with its principal place of business at 575 Shin-dong, Youngtong-gu Suwon, Kyonggi, South Korea. Samsung SDI is one of the largest CRT producers in the world. In 2000, Samsung SDI was the top manufacturer for CRTs, with a market share of approximately 20 percent. During the Class Period, Samsung SDI manufactured, sold, and distributed CRT Products throughout the United States.

32.    Defendants Samsung SDI America, Inc. ("Samsung America") is a California corporation with its principal place of business at 3333 Michelson Drive, Suite 700, Irvine, California. Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Class Period, Samsung America sold and distributed CRT Products manufactured by Samsung SDI throughout the United States.

33.    Defendants Samsung SDI and Samsung America are collectively referred to herein as "Samsung."

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON

34.    Defendant Samtel Color, Ltd. ("Samtel") is an Indian company with its principal place of business at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel's market share for CRTs sold in India is approximately 40 percent. The company is India's largest exporter of CRT Products. Samtel has obtained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products. During the Class Period, Samtel manufactured, sold, and distributed CRT Products throughout the United States.

35.    Defendant Thai CRT Company, Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand. Thai CRT is a subsidiary of Siam Cement Group. It was established in 1986 as Thailand's first manufacturer of CRTs for color televisions. During the Class Period, Thai CRT manufactured, sold, and distributed CRT Products throughout the United States.

36.    Defendant Toshiba Corporation ("Toshiba") is a Japanese company with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. In 2001, Toshiba held a worldwide market share of 5 to 10 percent for CRTs used in televisions and in computer monitors. In 2002, Toshiba entered into a joint venture with Defendant Matsushita Electric called Matsushita Toshiba Picture Display Co., Ltd., in which the entities consolidated their CRT businesses. In 2004, Toshiba entered into an agreement with Defendant Orion whereby Orion became the supplier and maker of Toshiba-branded CRT televisions. During the Class Period, Toshiba manufactured, sold, and distributed CRT Products throughout the United States.

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON

CLASS ACTION COMPLAINT    -10-

37.    Defendant Beijing-Matsushita Color CRT Company, Ltd. ("BMCC") is a Chinese company with its principal place of business at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  The company is the second largest producer of CRTs for televisions in China.  During the Class Period, BMCC manufactured, sold, and distributed CRT Products throughout the United States.

38.    Defendant Matsushita Toshiba Picture Display Co., Ltd. ("Matsushita-Toshiba") is a Japanese entity located at 1-1, Saiwai-cho,. Takatsuki-shi, Osaka 569-1193, Japan. Matsushita-Toshiba was formed as a CRT joint venture between Defendants Matsushita Electric and Toshiba.  Defendant Matsushita Electric purchased the remaining stake in Matsushita-Toshiba on April 3, 2007, making it a wholly-owned subsidiary.  During the class period, Matsushita-Toshiba manufactured, sold, and distributed CRT products throughout the United States.

39.    Defendant LP Displays International, Ltd. ("LP Displays") is a Hong Kong company located at 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays was formed as a CRT joint venture between Defendants LG Electronics and Royal Philips, called Philips Displays.  LG.Philips Displays became an independent company and changed its name to LP Displays on April 1, 2007.  The company is a leading CRT supplier, and currently produces one in every four CRT televisions and computer monitors sold.  In 2006, LP Displays had a worldwide CRT market share of 27 percent.  During the Class Period, LP Displays manufactured, sold, and distributed CRT Products to customers throughout the United States.

## CO-CONSPIRATORS

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON

CLASS ACTION COMPLAINT                                    -11-

40.    Wherever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegations mean that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

41.    The acts alleged in this Complaint to have been done by Defendants were performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of Defendants' business affairs.

42.    Various other persons, firms and corporations not named as Defendants herein have participated as co-conspirators in the violations alleged herein and have aided, abetted and performed acts and made statements in furtherance of the conspiracy.

## INTERSTATE TRADE AND COMMERCE

43.    The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce and caused antitrust injury in the United States.

44.    During the Class Period, Defendants collectively controlled a majority of the market for CRT Products, both globally and in the United States, and sold CRTs in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district, to customers located in the states other than the states or countries in which Defendants produced CRTs.

## CLASS ACTION ALLEGATIONS

45.    Plaintiff brings this action against Defendants under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following Class:

All persons (excluding Defendants, their predecessors, parents,

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON

| CLASS ACTION COMPLAINT | -12- | |

subsidiaries, affiliates, co-conspirators and any governmental agencies) in the United States who purchased CRTs or CRT products directly, for delivery in the United States, from Defendants or any of their predecessors, parents, subsidiaries, or affiliates, at any time during the period from January 1, 1995 through the present.

46.     Plaintiff does not know the exact number of Class members, because such information is in the exclusive control of Defendants or their co-conspirators. Due to the nature of the trade and commerce involved, however, Plaintiff believes that Class members number at least in the hundreds, and are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all Class members is impracticable.

47.     Plaintiff is a member of the Class. Plaintiff's claims are typical of the claims of the Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is a direct purchaser of CRTs and its interests are consistent with, and not antagonistic to, those of the other members of the Class. In addition, Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

48.     There are questions of law or fact common to the Class, including:

a.     Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy among themselves to fix, raise, maintain or stabilize prices of CRTs, to rig bids or to allocate markets or customers for CRTs;

b.     Whether Defendants' contract, combination or conspiracy as alleged in this Complaint violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

c.     Whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiff and the other members of the Class;

d.     The effect of Defendants' conspiracy on the prices of CRTs sold to purchasers in the United States during the Class Period; and

e.     The appropriate measure of damages sustained by Plaintiff and other members of the Class.

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON

49.    These questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

50.    A class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, effectively, and without the duplication of effort and expenses that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This Class action presents no difficulties in management that would preclude maintenance as a class action.

51.    Finally, the Class is readily definable and is one for which records likely exist in the files of Defendants and their co-conspirators.

## FACTUAL ALLEGATIONS

52.    CRTs consist of a vacuum tube that is coated on the inside with light sensitive phosphors.  An electron gun, located at the back of the vacuum tube, emits electron beams. When those electron beams strike the phosphors, the phosphors produce either a red, green, or blue light.  Magnetic fields and varying voltages inside the CRT direct the beams to produce the desired color.  This process is repeated several times per second to produce the desired image.

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON

**CLASS ACTION COMPLAINT** | -14-

53.    CRT technology was first developed more than a century ago. In 1931, the first commercially practical CRT television was made. However, it did not become widely available to consumer until 1939 when it was introduced at the World's Fair. Since then, CRTs have become the heart of most display products, including inter alia, televisions, computer monitors, automated teller machines, video game machines, video cameras, oscilloscopes, radar displays, projectors, medical electronics and avionics.

54.    The quality of a CRT display is dependent on the quality of the CRT itself. There are no external controls or features that can make up for a poor quality tube. Because the CRT defines the whole product, the product is often simply referred to as "the CRT." Approximately 40-50% of the cost of a CRT television is the cost of the component CRT.

55.    Initially, CRT televisions displayed only black and white images. However, in 1950, CRT technology was revolutionized with the advent of the color CRT. Despite refinements and incremental advancements, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today, as noted in a 2006 article, "is astonishingly similar to the one that RCA unveiled in 1950."

56.    In 1998, nearly 80 percent of electronic displays were CRT, while the number was only 36.2 percent in 2003 and CRTs are expected to be only 5.6 percent by 2013. Even though the CRT display market is declining, it is still sizable. According to the report Electronic Displays to 2008, the television screen portion of the U.S. CRT displays market was a $1.7 billion dollar industry in 2003 and is predicted to be $1.5 billion dollars in 2008.

57.    During the Class Period, the CRT industry has been dominated by relatively few companies. For example, in 2002, three companies - Defendants LP Displays (formerly known as LG.Philips Displays), Samsung and Chunghwa - controlled approximately 62 percent of the CRT market. In addition, the other named Defendants formed a significant portion of the

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON

CLASS ACTION COMPLAINT                                    -15-

remaining CRT market.

| Company | Share |
|---|---|
| LG.Philips Displays | 27% |
| Samsung SDI | 24% |
| Chunghwa Picture Tubes | 11% |
| Japanese Producers (including Hitachi, Toshiba) | 15% |
| Other | 23% |

**Source: The Electronic Times, compiled by DigiTimes, June 2002**

58.    The CRT industry also had substantial consolidation during the Class Period, including but not limited to: (a) the creation of LG. Philips Displays in 2001, which was a joint venture between Philips and LG Electronics' CRT businesses; (b) the merger of Toshiba and Matsushita in 2002 into Matsushita-Toshiba; and (c) Orion's agreement to manufacture CRT Products for Toshiba, which effectively took Toshiba's capacity out of the market.

59.    This concentration of market share facilitated Defendants' ability to implement and carry out the conspiracy.  Moreover, becoming involved in long-standing joint ventures, both in the CRT market and closely related markets, gave these supposed competitors continuous opportunities to discuss pricing, capacity utilization, and other key prospective market information.  The mutually beneficial nature of the business relations between certain Defendants not only provided the opportunity to conspire but a financial incentive to do so as well.

60.    There is a high degree of cooperation among supposed competitors in the CRT industry.  As stated above, many of the Defendants' have joint ventures that involve other competitors, either in the CRT market or in closely related markets.  In addition, several of the major competitors obtain CRTs from the same Indian company - Defendant Samtel.

**CLASS ACTION COMPLAINT** -16-

61. One of the most remarkable examples of cooperation between competitors in the CRT market involves a non-defendant, TPV Holdings, Inc. ("TPV"), which bills itself as the world's largest producer of CRT monitors. TPV has a series of joint ventures with Defendant Philips, which, as alleged above, has joint ventures with Defendant LG. In addition, TPV has joint ventures with Defendant HarmStar and another major Taiwanese manufacturer, CPT.

62. Defendant Chunghwa has a long-standing joint venture with Defendant Samsung's corporate parent for the production of liquid crystal display panels. Moreover, as part of an agreement to help resolve a patent dispute, Defendant Chunghwa now licenses technology from Defendant Philips.

63. Defendant Samsung's corporate family has a long-standing relationship with Chinese state-owned picture tube manufacturers, dating back to a 1993 joint venture.

64. Defendant LG Electronics and Hitachi, Ltd. entered into a joint venture in 2000 for the manufacture, sale, and distribution of optical storage products such as DVD drives.

65. Samcor Glass Limited is the result of a joint venture between Defendant Samtel, Defendant Samsung's corporate parent and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

66. Defendant Toshiba participates in a joint venture for the manufacture of CRT products with Defendant Orion, as well as non-defendants P.T. Tabung Gambar Indonesia and Japanese trading company Sumitomo Corporation.

67. Moreover, at least four of the competitors obtain picture tubes from Defendant Samtel. During at least part of the Class Period, Defendant Samtel claims to have supplied CRTs to defendants LG, Samsung, Philips, and Matsushita.

68. Aside from these formalized business relationships, Defendants maintain close relationships through common membership in trade associations. For example, Defendants

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON

CLASS ACTION COMPLAINT                    -17-

Chunghwa, Hitachi, and Samsung are all members of the Society for Information Display. Similarly, Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association. In addition, Defendants Orion, LG Electronics, LP Displays (formerly LG.Philips Displays), and Samsung are members of the Electronic Display Industrial Research Association. Defendants used these common memberships as a means to discuss and agree upon their pricing for CRT Products. In particular, Defendants, through these trade associations, and during meetings related to these trade associations, shared what would generally be considered proprietary and competitively sensitive information. This information exchange was used to implement and monitor the conspiracy.

69.    In order to accommodate the vacuum tube assembly, CRT televisions require a deep and bulky cabinet. In the 1990s, technological innovations led to the emergence of flat panel displays that would be slimmer and less bulky than CRT displays. Flat panel displays were incorporated into consumer products such as computer monitors and televisions. Prior to their introduction, CRTs had dominated the market for these applications.

70.    CRTs, as the established technology, had a distinct price advantage over these new technologies. In contrast to an emerging industry where participants invest heavily in research, development, and bringing capacity online, the CRT industry made and recouped such investments long before the start of the Class Period. Thus, CRT manufacturers had very little debt or interest expense on their facilities, and the pressure to produce at full capacity (to avoid default) was lessened. This created an environment in which collusion to fix prices, despite the risk of lower demand, was possible.

71.    During the Class Period, the CRT industry faced significant market pressures and reduced profitability. As stated in a September 25, 2001 article on ZDNet News entitled *Report, CRT Revenue to plunge*:

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON

CLASS ACTION COMPLAINT                    -18-

After decades of growth, revenue from cathode ray tube monitors is expected to drop significantly over the next several years ... 'A combination of price erosion, a slowing in the movement to large screens, and a gradual shift in market opportunities from developed regions to developing regions is causing the drop in revenue,' Stanford Resources analyst Rhonda Alexander said Tuesday. The growing popularity of flat panel monitors will also have an effect on CRT revenue.

72.    Market research firm iSuppli Corp. predicted in 2006 that sales of LCD televisions in 2007 would, for the first time, surpass sales of CRT televisions. The firm also forecasted that sales of CRTs would drop from an estimated 14.4 million units in 2006 to 10.4 million units in 2007. iSuppli predicted that in 2010, CRT televisions would account for only 2.1 million of the 44 million televisions sold.

73.    Due to their price and durability, CRTs still remain popular in schools and other public areas, as well as in developing countries like China. CRT technology is also maintaining its popularity in the area of low-cost monitor and smaller size televisions. According to a Texas based research firm, DisplaySearch Inc., CRTs will maintain a 65 percent share of 25-inch to 29-inch displays sold in 2009, whereas CRTs will have only a 1 percent share of 35-inch to 39-inch displays sold in the same year. According to Japanese industry estimates, some 60 percent of the demand for color televisions in the 12 month period ending in March of 2008 will be for CRT-based models. Recent press reports have indicated that slim CRT televisions devekoped by Samsung and LG Electronics may help to revitalize the category.

74.    DisplaySearch Inc. predicts that the worldwide capacity to manufacture CRTs will decrease from over 250 million units in 2006 to less than 150 million units by 2010. At various times during the conspiracy, in order to keep prices high, Defendants colluded to restrain output of CRTs as alleged below.

75.    The Defendants herein consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices during the Class

Period.

76.    On July 15, 2003, Mitsubishi Electric closed a CRT plant in northern Mexico, just five years after the plant was opened. The plant's closure resulted in a loss of capacity to manufacture 2.7 million CRTs a year for 17-inch computer monitors. This was one of the principal applications for CRTs during this time period.

77.    In December of 2004, Matsushita Toshiba closed its American subsidiary's operations in Horeseheads, New York citing price and market erosion. Matsushita announced that the closing was part of the company's "global restructuring initiatives in the CRT business." The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

78.    In December 2004, Toshiba announced that it too would discontinue manufacturing traditional CRT televisions. Thereafter, Toshiba entered into an agreement to have Orion manufacture all Toshiba-brand CRT televisions.

79.    In July 2005, LG Philips discontinued CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

80.    In December 2005, Matsushita-Toshiba announced it would close its American subsidiary's operations in Ohio. The company also announced that it would close its operations in Germany, by early 2006. Similar to LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

81.    In late 2005, Samsung SDI closed its CRT factor in German, following the lead of other CRT manufacturers.

82.    In July 2006, Orion America shut down a CRT manufacturing plant in Princeton, Indiana. In the same month, Matsushita announced it was shutting down its CRT factory in

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON

CLASS ACTION COMPLAINT                                    -20-

1   Malaysia and liquidating its joint venture with Toshiba.

2       83.     Plaintiff is informed and believes, and thereon alleges, that in order to control and

3   maintain profitability during a time when the demand for CRTs was declining, Defendants

4   conspired to fix, raise, maintain, and stabilize the price at which CRT Products were sold in the

5   United States at artificially inflated and anticompetitive levels.

6       84.     Unusual price movements in the CRT market are evidence of Defendants'

7   collusion.  For example, in the 1990s, industry analysts repeatedly predicted declines in

8   consumer prices for CRTs that did not fully materialize.  In 1992, an analyst for Market

9   Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with

10  technological improvements and advances in manufacturing techniques, will produce a drop in

11  the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.

12  19.  Despite such predictions, and the existence of economic conditions warranting a drop in

13  prices, CRT prices remained stable.

14      85.     Another industry source noted in 1996 that "the price of the 14" tube is at a

15  sustainable USD50 and has been for some years ......"

16      86.     In reality, consumer prices for CRT monitors never approached $50 in 1997.

17  They were consistently more than double this price.

18      87.     Despite the ever-increasing popularity of, and intensifying competition from, flat

19  panel displays, prices for CRTs were "stuck stubbornly at high price levels" throughout 1995

20  according to a CNET News.com article.  This price stabilization was purportedly due to a

21  shortage of critical components such as glass.  However, this was a pretext used to conceal the

22  conspiracy.

23      88.     Prices for CRT monitors did drop sharply as a result of the 1998 Asian economic

24  crisis, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia

COHEN, MILSTEIN,
HAUSFELD & TOLL,
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON

CLASS ACTION COMPLAINT                               -21-

Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

89.     Despite declining production costs and the rapid entry of flat panel display products in early 1999, the price of large-sized color CRTs actually rose. It was alleged that the price increase was based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants.

90.     After experiencing an oversupply of 17-inch CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. An article dated March 13, 2000 in Infotech Weekly quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

91.     On June 1, 2004, LG Electronics raised the prices of its 15-inch and 17-inch CRT monitors in India. This price hike was falsely attributed to a shortage of glass needed to manufacture CRTs.

92.     Over the course of the conspiracy period, despite the natural trend in most technology products to go down over time, the price of CRTs remained stable, and in some instances went up in an unexplained manner. Being the mature nature of CRT technology, the costs of production were relatively low compared to other emerging technologies. Yet, CRT prices withstood downward price pressures and remained stable over a period of many years. Even in periods of declining prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not fall as much as they would have absent anticompetitive conduct. As Finsen Yu, President of Skyworth Macao Commercial Off shore Co., Ltd, a television maker was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

| CLASS ACTION COMPLAINT | -22- | |

93.    By exchanging information about their prices, price moves, contract prices to large customers, capacity, capacity utilization, as well as technological and manufacturing advances, Defendants were able to stabilize the price of CRTs.  Defendants engaged in these discussions through e-mail communications, telephone calls, and in person meetings.  This price stability for the period of 2004 to 2007 is depicted in the following charts of average sale prices ("ASP"):

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON





94.      Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information. One example is the Korea Display Conference ("KDC"), hosted by Displaybank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers. Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Researcgh Association of Korea. EDIRAK had a stated goal of "promotiong co-activity with foreign Organizations related to display industries." Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC"). In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

95.      Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

96.      The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007. Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics. Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

97.      In May of 2007, EDIRAK and KODEMIA were subsumed into a new trade organization called KDIA, the Korean Display Industry Association. The companies that were the initial participants in this association included those within Samsung and LG Electronics that had responsibility for CRT Products. Lee Sang-Wan of Samsung promised that "[w]e will carve

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON

CLASS ACTION COMPLAINT                                    -25-

1   out the future of the industry through official gatherings of the association."

2      98.    This cooperation is not confined to South Korea. As Lee Sang-Wan was quoted

3   as saying the following August of 2007 about KDIA's plans to further international alliances,

4   "[m]ore than any other industry field, the global partnership among the companies in the display

5   field has been in good operation, and this has been the driving force behind the technology

6   development of displays and industrial growth....[O]ur association, too, plans to seek global

7   coexistence and cooperation among the panel producing countries that happen to be

8   concentrated in Northeast Asia; that is Japan, Taiwan, and China. Specifically, we plan to set up

9   a system that can handle the matters related with the information sharing between the producers,

10  cope with the issues of intellectual property rights, request governments to improve systems and

11  jointly deal with the regulations of North America and Europe. To achieve this, we plan to

12  arrange a meeting among the heads of display associations so that they can discuss ways to

13  enhance mutual cooperation within the end of this year."

14     99.    Other opportunities to collude among the defendants were provided by events

15  sponsored by the Society for Information Display, such as the annual Asian Symposiums on

16  Information Display, the annual International Display Manufacturing Conference and Exhibition

17  (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on

18  Information Displays (held in Daegu, Korea) and the annual International Display Workshops

19  (the most recent ones of which have been held in Japan).

20     100.   Defendants have been the subject of multiple government investigations based on

21  their cartel activity in recent years.  For example, Samsung admitted guilt and paid a $300

22  million fine into price-fixing among manufacturers of dynamic random access memory

23  ("DRAM") computer chips following an investigation by the United States Department of

24  Justice ("DOJ").  Additionally, Samsung, Hitachi and Toshiba have all acknowledged being

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON

CLASS ACTION COMPLAINT                                    -26-

contacted by the DOJ as part of a continuing investigation into collusion among manufacturers of static random access memory ("SRAM") computer chips. Samsung is also being investigated as part of a DOJ antitrust investigation into the flash memory market and Samsung's and LG Philips' LCD manufacturing arms are among the targets of another multinational antitrust pricefixing probe.

101.    Recently, the DOJ initiated an investigation of Samsung, Toshiba and Hitachi, among others, concerning collusion among manufacturers of thin film transistor liquid crystal display ("TFT-LCDs") and flash memory computer chips.

102.    Plaintiff is informed and believes, and alleges thereon, that Defendants are currently under investigation by government authorities around the world for anticompetitive conduct in connection with the CRT industry. Plaintiff is further informed and believes, and alleges thereon, that the US investigation of the CRT conspiracy is being conducted by the DOJ's Antitrust Division in the Northern District of California.

103.    On November 8, 2007, Bloomberg.com reported that European Commission officials carried out unannounced raids on manufacturers of CRTs based on suspected anticompetitive conduct. That same day, the European Commission issued a press release stating that, "The commission has reason to believe that the companies concerned may have violated EU rules against price-fixing, sharing markets or exchanging market information."

104.    On November 9, 2007. Matsushita Electric and Samsung reported that they were cooperating with Japanese antitrust authorities who reportedly raided the companies' CRT production facilities on suspicion of anticompetitive conduct. It was also announced that Korean competition authorities were investigating Samsung in connection with the CRT market.

105.    Similarly, on November 12, 2007, Chunghwa announced that it had received a summons from the DOJ for involvement in a CRT price-fixing cartel.

106.    Finally, on November 21, 2007, Philips acknowledged that it is being investigated as well.  The International Herald Tribune reported that "competition authorities in several jurisdictions had started investigations," and that the company "would assist regulators."

107.    The above combination and conspiracy has had the following effects, among others:

a.    Price competition in the sale of CRT Products by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

b.    Prices for CRT Products sold by Defendants has been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.    Direct purchasers of CRT Products from Defendants deprived of the benefit of free and open competition in the purchase of CRT Products.

## FRAUDULENT CONCEALMENT

108.    Plaintiff had neither actual nor constructive knowledge of the facts constituting their claim for relief despite diligence in trying to discover the pertinent facts.  Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until November of 2007, when investigations by the European Commission and Japanese Authorities became public.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put plaintiff or the Class on inquiry notice that there was a conspiracy to fix prices for CRTs.

109.    Plaintiff is informed believes and alleges thereon that Defendants had covert discussions about price and output.  Defendants agreed not to publicly discuss the nature of the scheme and provided pretextual justifications to the public and their customers for the inflated prices of CRTs, in furtherance of the conspiracy.

110.    In 1999, as alleged above, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  However, this price

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON

CLASS ACTION COMPLAINT                    -28-

1    rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

2        111.    As alleged above, despite increased competition from flat panel monitors, prices

3    for CRT monitors were "stuck stubbornly at high price levels" throughout 2001.  This price

4    stabilization was purportedly the result of a shortage of critical components such as glass.  This

5    was a pretext used to conceal the conspiracy.

6

7        112.    Additionally, when several CRT manufacturers, including Defendants Samsung,

8    Philips, and LG Electronics, increased the price of CRT Products in 2004, the price hike was

9    attributed to a shortage of glass shells use for manufacturing CRT monitors.  In justifying this

10   price increase, a Deputy General Manager for an LG Electronics distributor in India stated (in a

11   article available at http://www.techtree.com/India/News/Major Monitor Manufacturers hike

12   CRT_prices LG follows Suit/551-52715-581.html), that "[t]his shortage [of glass shells] is a

13   global phenomena and every company has to increase the prices of CRT monitors in due course

14   of time."

15

16       113.    Manufacturers such as LG Electronics periodically issued press statements falsely

17   asserting that CRT prices were being driven lower by intense competition.

18       114.    Plaintiff is informed believes and alleges thereon that Defendants' alleged

19   reasons for the price increases of CRTs were materially false and misleading and made for the

20   purpose of covering up Defendants' anti-competitive scheme as herein alleged.

21       115.    Due to Defendants' fraudulent concealment of their conspiracy, the running of

22   any statue of limitations has been tolled with respect to any claims that plaintiff and the Class

23   members have as a result of the anticompetitive conduct alleged in this Complaint.

24

25

26

27

28

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON

| CLASS ACTION COMPLAINT | -29- | |

## CLAIMS FOR VIOLATION OF
## SECTION 1 OF THE SHERMAN ACT – 15 U.S.C. § 1

116.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

117.    Beginning at least as early as January 1, 1995 and continuing thereafter through at least the present, the exact dates being unknown to Plaintiff, Defendants contracted, combined or conspired to fix, raise, maintain and stabilize prices of CRTs in the United States at artificially high and inflated levels, all in violation of 15 U.S.C. § 1.

118.    The contract, combination or conspiracy of Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

119.    In order to formulate and effectuate their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a.    Taking part in meetings and conversations to discuss the prices and supply of CRT products;

b.    Communicating orally and in writing to fix prices;

c.    Agreeing to fix, raise, maintain and stabilize prices and the supply of CRT Products sold in the United States in a manner that deprived direct purchasers of open and free competition;

d.    Issuing price announcements and price quotations in accordance with the agreements reached;

e.    Selling CRT Products to customers in the United States at non-competitive prices; and

f.    Providing false statements to the public to explain increased prices for CRT Products.

120.    As a direct and proximate result of the unlawful conduct of Defendants and their co-conspirators, as alleged in this Complaint, Defendants have restrained competition in the sale of CRTs, and Plaintiff and the other members of the Class have been injured in their business

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON

CLASS ACTION COMPLAINT                    -30-

1    and property in that they paid more during the Class Period for CRTs than they otherwise would

2    have paid in the absence of the unlawful conduct of Defendants and their co-conspirators.

3                                          **DAMAGES**

4    121.    During the Class Period, Plaintiff and other members of the Class purchased

5    CRTs directed from the Defendants, or their subsidiaries, agents, and/or affiliates, and, by

6    reason of the antitrust violations alleged herein, paid more for such products than they would

7    have paid in the absence of Defendants antitrust violations.  As a result, Plaintiff and other

8    members of the Class have sustained damages to their business and property in an amount to be

9    determined at trial.

10                                   **REQUEST FOR RELIEF**

11   **WHEREFORE**, Plaintiff, individually and on behalf of the Class proposed in this

12   Complaint, respectfully requests:

13   A.    That the Court certify the Class pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3),

14   and adjudge Plaintiff to be an adequate representative thereof;

15   B.    That Defendants' unlawful combination, contract, or conspiracy as alleged in this

16   Complaint be adjudicated and decreed a per se violation of Section 1 of the Sherman Act, 15

17   U.S.C. § 1;

18   C.    That Plaintiff and the Class recover damages against Defendants and their co-

19   conspirators, jointly and severally, in an amount to be trebled in accordance with the antitrust

20   laws pursuant to 15 U.S.C. §15(a);

21   D.    That Defendants, their affiliates, successors, transferees, assignees, and the

22   officers, directors, partners, agents and employees thereof, and all other persons acting or

23   claiming to act on their behalf, be permanently enjoined and restrained from, in any manner:

24   (1)    continuing, maintaining or renewing the contract, combination or

25   conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy

26   

27   

28

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON

CLASS ACTION COMPLAINT                                    -31-

1  having a similar purpose or effect, and from adopting any practice, plan, program or device

2  having a similar purpose or effect; and

3           (2)      communicating or causing to be communicated to any other person

4  engaged in the manufacture, distribution or sale of CRT information concerning prices, refraining

5  from selling, customers, markets or other terms or conditions of sale of any such product except

6  to the extent necessary in connection with bona fide sales transactions between the parties to such

7  communications.

8

9           E.      That Plaintiff and the Class be awarded the expenses and costs of suit, including

10 reasonable attorneys' fees, to the extent provided by law;

11          F.      That Plaintiff and the Class be awarded pre-judgment and post-judgment interest at

12 the highest legal rate to the extent provided by law; and

13          G.      That Plaintiff be awarded such additional relief as the Court may deem proper.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COHEN, MILSTEIN,
HAUSFELD & TOLL,
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON

CLASS ACTION COMPLAINT                                        -32-

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all claims in this Complaint so triable.

Dated: December 21, 2007                COHEN MILSTEIN HAUSFELD & TOLL,
                                        P.L.L.C.


By: _____
    Michael P. Lehmann
    **COHEN MILSTEIN HAUSFELD & TOLL,
    P.L.L.C.**
    One Embarcadero Center
    Suite 2440
    San Francisco, CA 94111
    Tel: (415) 986-3321
    Fax: (415) 986-3643

    Michael D. Hausfeld
    **COHEN MILSTEIN HAUSFELD & TOLL,
    P.L.L.C.**
    1100 New York Avenue, N.W.
    Suite 500, West Tower
    Washington, DC 20005
    Tel: (202) 408-4600
    Fax: (202) 408-4699

    Robert Eisler
    Sharon K. Robertson
    **COHEN MILSTEIN HAUSFELD & TOLL,
    P.L.L.C.**
    150 E. 52nd Street, 30th Floor
    New York, NY 10022
    Tel: (212) 838-7797
    Fax: (212) 838-7745

    Michael D. Shaffer
    **SHAFFER & GAIER, LLP**
    One Penn Center
    1617 JFK Boulevard, Suite 946
    Philadelphia, PA 19103
    Tel: (215) 751-0100
    Fax: (215) 751-0723

COHEN, MILSTEIN,
HAUSFELD & TOLL,
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON

CLASS ACTION COMPLAINT                                -33-

1

2

3

4

5

6

7

8

9

10

11

12

Allan Steyer
**STEYER LOWENTHAL BOODROOKAS**
**ALVAREZ & SMITH LLP**
One California Street, Third Floor
San Francisco, CA 94104
Tel: (415) 421-3400
Fax: (415) 421-2234

Natalie Finkelman-Bennett
**SHEPHERD, FINKELMAN,**
**MILLER & SHAH, LLC**
35 East State Street
Media, Pennsylvania 19063
Tel: (610) 891-9880
Fax: (610) 891-9883

Roberta Liebenberg
**FINE, KAPLAN AND BLACK**
1835 Market Street, 28th Floor
Philadelphia, PA 19103
Tel: (215) 567-6565
Fax: (215) 568-5872

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Attorneys for Plaintiffs*

COHEN, MILSTEIN,
HAUSFELD & TOLL
P.L.L.C.
ATTORNEYS AT LAW
WASHINGTON

| CLASS ACTION COMPLAINT | -34- | |